Filed 12/31/20  P. v. Eagle CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br>v.<br><br>DENNIS RAY EAGLE,<br><br>      Defendant and Appellant. | A157735<br><br>(Alameda County<br>Super. Ct. No. 612133) |

A jury convicted appellant Dennis Ray Eagle of one count of first degree murder with a rape special circumstance for the 1979 murder of Betty Elias. He was sentenced to a term of life without the possibility of parole.  He was not charged with the crime until January 2016, after his deoxyribonucleic acid (DNA) profile was matched to DNA obtained from the murder victim. On appeal, he argues that the trial court abused its discretion in denying his motion to dismiss for delay in prosecution, violated his Sixth Amendment right of confrontation when it admitted certain case-specific hearsay testimony by the prosecution's fingerprint expert, and violated his right to due process by imposing fines and fees without making a determination of his ability to pay.  Appellant also contends that the prosecutor committed misconduct during closing argument and asserts that a parole revocation fine was erroneously imposed.  We agree the abstract of judgment must be

1

corrected to delete the parole revocation fine but otherwise affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Following a preliminary hearing, an information was filed in August 2018 charging appellant with the October 28, 1979 murder of Elias (Pen. Code,[1] § 187, subd. (a)) with a rape special circumstance (§ 190.2, subd. (a)(17)(C)).

### A.    The Prosecution's Case

#### i.    *The Crime Scene*

On Sunday, October 28, 1979, at around 11:20 a.m. Officer Aramis Pabon of the Oakland Police Department (Department) was dispatched to a room in a residential hotel on San Pablo Avenue on the report of a dead body. When he arrived, Officer Pabon observed the victim lying on her back on the bed. The room was in disarray as if there had been a struggle. Officer Pabon confirmed she was deceased. He preserved the crime scene until evidence technician Kevin Traylor and homicide Detective Garry Furry arrived, then left to canvass the area for potential witnesses.

Traylor entered the room and saw the victim lying on the bed. Her body was partially covered by a curtain and by items of clothing that were scattered on the bed. She had blood-like material around her head and neck. A pair of green and grey-checked polyester pants intertwined with a pair of women's panties was by her head. The door showed no signs of forced entry. Traylor documented the crime scene and took photographs. He diagramed the apartment and marked certain items of evidence so they could be placed in Department storage. He also dusted the crime scene for fingerprints.

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

2

After the coroner arrived, Traylor took photographs showing that the victim was nude from the waist down. A sheet had been placed across her head and shoulders. She was wearing a jacket, a shirt, and a bra that that had been cut in half in the front. Her hands were lying across her abdomen.

Traylor observed a curtain rod under the right side of the bed. The rod was bowed, as if the curtain had been pulled down from the window to drape over the body. The rod appeared to have bloodstains on it. Several fingerprint-like ridge definitions were readily visible in the blood. He packaged the rod carefully to avoid contact with its surface and took it to the Department's office, where he photographed it.

Two days later, Detective Furry asked Traynor to examine an apartment on Jefferson Street that was inhabited by a potential suspect named Frank Malone. Inside the apartment Traynor found a rent receipt in the name of Martin Rosales. Traynor was asked to look for any physical evidence that might relate to the victim. He found a prescription bottle in the name of Betty Elias. He also recovered some latent fingerprints and a straightened wire coat hanger, which defense counsel later argued could have been used as the murder weapon.

### ii.    *The Autopsy*

Dr. Thomas Rogers performed the autopsy on Elias. During the autopsy, he took photographs and collected evidence, such as blood and tissue samples. Because this case appeared to involve a sexual assault, he took oral, vaginal, and rectal swabs. The swabs were then rubbed over the surface of a microscope slide. He also clipped the victim's fingernails to preserve as evidence. In 1979, DNA testing was not available.

Dr. Rodgers observed a number of external blunt injuries including abrasions on Elias's right forehead and right eye, a laceration over the bridge

3

of the nose, scrapes on the left side of the nose and in the left lip, along with a group of bruises on the left side of the lower jaw and the right side of the chin and neck. A laceration along the lower right jaw had penetrated into the mouth. The blunt force injuries could have been caused by being struck in the face with a hand or being thrown against a hard surface.

Injuries to Elias's neck and jawline were consistent with injuries caused by strangulation. There were other injuries to her hands, right leg, torso, left collarbone, and the chest in the area of the sternum. The injuries on the hands and arms were consistent with defensive wounds. Petechial hemorrhages in the eyes were consistent with asphyxia strangulation. An internal examination of her neck showed multiple hemorrhages in the soft tissue and revealed that her larynx was broken in three separate places.

A toxicology study of Elias's blood showed she had a blood-alcohol level of .24 percent at the time of death. At this level, a person may be uncoordinated, have an unsteady gait, and slurred speech. Dr. Rodgers concluded the cause of death was asphyxiation by strangulation. The time of death could have been the day the body was discovered up to several days prior.

### iii.   *Forensic Analysis*
#### a.  *DNA Evidence*

In 2015, Detective Herb Webber, who was assigned to the cold case homicide unit, asked the Department's crime lab to conduct a DNA analysis for this case. There had been a prior request for a DNA analysis, but due to a Department backlog the analysis had not been done. Laura Silva, a criminalist supervisor, supervised Jennifer Sealy, who performed the DNA analysis. Silva testified at trial as an expert in developing DNA profiles.

4

The DNA analysis was performed from material found on a vaginal smear slide. While the sample was somewhat degraded, there were enough sperm cells on the slide to obtain a DNA profile. The FBI's Combined DNA Index System (CODIS) national database matched appellant's DNA profile to the sample. The DNA profile was later matched to a reference sample obtained from appellant. The DNA profile in this case would be expected to occur approximately one in 16 trillion members of the population. The victim's clothing and fingernail clippings were also tested, but did not reveal any male DNA so no further testing was done. Subsequent testing determined that the fingernail clippings contained the victim's DNA only.

At trial, defense counsel conceded in his opening argument that the DNA found in the victim belonged to appellant, and that appellant and the victim must have had sexual intercourse at some point in time.

### b. Fingerprint Evidence

Kimberly Lankford was a latent fingerprint examiner for the Department. She had been working in the field for almost 30 years at the time of trial. She testified as an expert in fingerprint analysis. Lankford was assigned to this case in early 2015 after Detective Webber submitted a request for information. She collected all the latent fingerprint lifts in the case file.

In July 2015, she was contacted by Detective Richard Vass. Detective Vass brought in a set of appellant's fingerprints that he had obtained from the FBI and asked her to compare them to the latent lifts. Lankford knew that appellant had been identified as a suspect based on DNA evidence, but she did not know how the evidence had been found. Detective Vass did not put any pressure on her, directly or indirectly, to reach a particular conclusion.

Lankford initially analyzed the latent print from the bloody curtain rod by referencing the photograph taken by Traylor in 1979. She later obtained and photographed the curtain rod to confirm for herself that the 1979 photograph was authentic. She determined the print matched one of appellant's known fingerprints, based on more than eight points of similarity. Specifically, the latent print matched appellant's left middle finger. Her conclusions were verified by a second fingerprint examiner.

Lankford acknowledged at trial that there have been notable errors in fingerprint identification analysis. To avoid bias, she analyzed the latent print before examining appellant's known impressions. In her opinion, the Department's crime lab implements best practices to avoid bias.

### iv. Appellant's Police Interview

Detective Vass became aware of this cold case in June 2015, after Sealy told him DNA evidence had linked appellant to the crime. He reviewed the original reports on the case and asked Lankford to compare the fingerprints on the curtain rod with appellant's known prints. He did not consciously do anything to try and influence her comparison. After she told him that she believed the fingerprint from the curtain rod was a match, he decided to interview appellant and obtain a DNA sample from him for confirmation. He arranged to meet appellant (who was incarcerated in another state) in October 2015.

Although Detective Vass knew that the forensic evidence tied appellant to the crime, he did not disclose this to appellant during the interview. Instead, he told appellant he thought appellant might have information about a murder. He also collected DNA evidence from appellant via a buccal swab. A recording of the interview with appellant was played for the jury.

6

In the interview, appellant stated that he was a member of the Sioux tribe and had lived in Montana for most of his life. When he was in the sixth grade he lived with a cousin in San Jose, but he had never been to Oakland. In 1979 he was living on a reservation in Montana. During the interview, Detective Vass showed appellant a photograph of the victim and a photo of the building where the crime was committed. Appellant said he did not recognize either photo.

Appellant told the officers that he had been arrested in 1980 for burglary on the reservation in Montana. He remembered he had entered a building that belonged to the owner of a gas station and stole gas cans and oil. He was placed on probation for two years. He also told the officers that he had been arrested in Texas in 1988. In that instance, he had been in a bar and a friend told him to come over. He was very drunk and entered the wrong house. He woke up in jail.

## B.    The Defense Case

### i.    *Testimony of Elias's Acquaintance*

David Larson testified that he lived in the same hotel as Elias in 1979 and had known her for about three months before she was killed. Larson worked as a bartender at a club called the Virginia Club, which was around the corner from where Elias worked at a bar called La Palmera. Larson knew that Elias was dating a Mexican man named "Francisco," who was also known as "Martin Rosalis."[2] They had not been together for very long.

A few days after Elias's death, Larson was interviewed by law enforcement. He told an officer that Rosales lived in an apartment at Ninth

---

[2] This individual was referred to by various names at trial, including Frank Malone, Francisco, Martin Rosalis, and Martin Rosales. In our discussion, we will refer to him as Martin Rosales.

7

Street and Jefferson Street, and that Rosales and Elias would go back and forth to each other's apartments. The last time he saw Rosales with Elias was a week before she was killed. He also told the officer that Francisco had come to the Virginia Club on the Friday night before Elias's death and had two beers and a mixed drink before leaving. Rosales looked "down in the dumps about something."

That night at the hotel at about 1:00 or 1:30 a.m., he heard Elias and Francisco "hollering and screaming at each other." She said she wanted her keys back. She kept her room locked all the time and Francisco was the only person who had a key. The couple frequently argued late at night, but Larson had never seen Elias injured or bruised in any way.

### ii.   Testimony of Fingerprint Reliability Expert

Simon Cole, a criminology professor at the University of California at Irvine, testified as an expert witness in the history, reliability, and error rates of fingerprint analysis, including the areas of contextual and confirmation bias.

Professor Cole stated that there are no actual nationwide standards on how to declare a match between two sets of fingerprints. The International Association for Identification, a professional organization of identification professionals, has advised its members not to assert infallibility in reporting their findings. Errors in fingerprint identifications have occurred in the past, with the best known case being Brandon Mayfield. Mayfield was misidentified as having been involved in the 2004 Madrid train bombings when his fingerprints were flagged in a database comparison. An Algerian man living in Spain was eventually identified as the actual source of the incriminating fingerprint. The identification errors made in that case have resulted in improvements to the latent print discipline. Studies have sought

to examine the error rate for fingerprint identification, but no actual error rate has been determined. The false positive error rate in at least one study was less than 1 percent. There is a higher error rate for false negatives.

Professor Cole testified that fingerprint comparisons can be influenced by confirmation and contextual bias. Implicit confirmation bias occurs if a person verifying a match knows that only certain classes of identifications are submitted for confirmation. Unconscious confirmation bias is the tendency to confirm a conclusion if you know what the original determination was. This tendency is not possible to control for, so the only way to avoid it is to keep the verifier blind to the conclusion that the original examiner reached.

Contextual bias is bias that might arise from knowledge of the circumstances of the case, including knowing that the individual has already been identified through DNA evidence. Information unrelated to the fingerprint analysis itself is considered "task irrelevant." The less information a fingerprint examiner has about a case, the better, so that he or she is less likely to be influenced by either kind of bias. It is a better practice to analyze the latent print by itself and to document its features before viewing the known print. On cross-examination, Professor Cole stated that even if an examiner receives information that could create bias, there is no way to know whether his or her conclusion was actually influenced by bias.

## C. Summation and Verdict

The prosecutor argued that the evidence showed Elias was sexually assaulted contemporaneous to her murder. The crime was committed by appellant. The DNA evidence obtained from the sperm found inside the victim came from a single source, which was appellant. The fingerprint on the curtain rod that was inked in blood also belonged to appellant.

9

Defense counsel argued that there were reasons to be skeptical of the fingerprint evidence in this case. For example, the individual who verified Lankford's analysis knew she had made an identification and the verification copy had her notations on it. Lankford did not analyze the latent print before she received appellant's exemplar, did not submit the latent print to a fingerprint database, did not document every step of her work, and had been given a lot of "task irrelevant" information. Counsel told the jury that confirmation bias had led to misidentification of the fingerprint.

After arguments were concluded, the jury was instructed on the applicable law. The following afternoon, the jury reached its verdict, finding appellant guilty as charged. Appellant was sentenced to a term of life in prison without the possibility of parole. Various fines and fees were imposed. This appeal followed.

## II. DISCUSSION

### A. Motion to Dismiss for Delay in Prosecution

Appellant first contends that the trial court erred in denying his motion to dismiss based on the 36-year delay between Elias's murder and the filing of the complaint against him. He asserts the delay prejudiced his ability to prepare a defense and receive a fair trial in violation of fundamental principles of due process.

#### i. *Additional Background*

In August 2017, appellant moved to dismiss the charges against him for want of prosecution and denial of his right to due process. The following facts were presented to the trial court.

During the initial investigation from 1979 to 1980, the police department collected biological and fingerprint evidence from the scene. The department also interviewed various neighbors and friends, some of whom

10

claimed to have heard Elias fighting with her then boyfriend shortly before her death. The boyfriend was known by various names, including Francisco, Frank Malone, Martin Rosiles and Martin Rosales. As described above, Rosales's apartment was searched, yielding a prescription pill bottle in Elias's name, a rent receipt, a coat hanger, and fingerprints.

The investigation was reopened in 1993. An investigation report prepared by Detective Webber noted that a fingerprint comparison was completed in April 1993 and that eight latent impressions had been identified as belonging to "Martin Rosilas." Rosales was apparently never contacted by police. Photographs of the fingerprints on the curtain rod found in Elias's room had been submitted to the California automated latent fingerprint system "with negative results."

The investigation was next reopened in 2000, after Elias's sister called Sergeant Haney to report that the victim's "20[-]year[-]old boyfriend" might have been the killer. Haney learned that Rosales was last arrested in 1977, and he provided Rosales's fingerprint to the crime lab to obtain a comparison to the bloody prints. Two years later, the comparison was completed but there was no match. Forensic DNA work was not requested at that time.

In 2012, Department investigators reopened the case and Detective Webber requested DNA testing. The Department's crime lab did not receive the autopsy slides and associated evidence until three years later, in March 2015. The sperm cell profile was submitted for comparison to the CODIS national database in early 2015. The following month, the FBI reported that appellant's DNA profile matched the vaginal slide sample.

Following a hearing in March 2018, the trial court denied the motion to dismiss. Appellant moved for reconsideration after the preliminary hearing,

11

asserting that evidence adduced at the hearing supported the claim of unreasonable delay. The trial court denied the motion for reconsideration.

### ii. *Applicable Legal Principles*

Both the state and federal Constitutions protect a defendant from the prejudicial effects of lengthy delay between the commission of the crime and the defendant's arrest and charging. (*People v. Nelson* (2008) 43 Cal.4th 1242, 1250 (*Nelson*).) Under federal law, due process requires dismissal of the indictment if it is shown that delay in the case caused substantial prejudice to the defendant's right to a fair trial and the delay was an intentional effort to gain a tactical advantage over the defendant. (*People v. Martinez* (2000) 22 Cal.4th 750, 765.) The record before us does not support a finding of intentional delay for the purpose of tactical advantage, and appellant does not contend otherwise.

Under California law, negligent delay in bringing charges, when accompanied by a showing of prejudice, may violate due process. Negligent delay requires a greater showing of prejudice to establish a due process violation than intentional delay. (*Nelson, supra,* 43 Cal.4th at pp. 1255–1256.) To avoid murder charges on the ground of prosecutorial delay, the defendant must affirmatively show prejudice. The prosecution may offer justification for the delay, and the court considering a motion to dismiss must balance the harm to the defendant against the justification for the delay. (*Id.* at p. 1250.) "Even a minimal showing of prejudice may require dismissal if the proffered justification for delay is insubstantial. By the same token, the more reasonable the delay, the more prejudice the defense would have to show to require dismissal." (*People v. Dunn-Gonzalez* (1996) 47 Cal.App.4th 899, 915 (*Dunn-Gonzalez*).)

12

Prejudice may be demonstrated by " 'loss of material witnesses due to lapse of time [citation] or loss of evidence because of fading memory attributable to the delay.' " (*People v. Catlin* (2001) 26 Cal.4th 81, 107, quoting *People v. Morris* (1988) 46 Cal.3d 1, 37.)  The showing of prejudice must be made on competent evidence and "must be supported by particular facts and not . . . by bare conclusionary statements." (*Crockett v. Superior Court* (1975) 14 Cal.3d 433, 442.)  "We review for abuse of discretion a trial court's ruling on a motion to dismiss for prejudicial prearrest delay [citation], and defer to any underlying factual findings if substantial evidence supports them." (*People v. Cowan* (2010) 50 Cal.4th 401, 431 (*Cowan*).)

### *iii.    Analysis*

Appellant contends the prosecution was negligent, and the delay unjustified, when authorities failed to test the evidence on three different occasions when the case was reopened in 1993, 2000, and 2012.  He argues that CODIS (the national DNA database) was established and fully operational in California in 1998.  He notes he was arrested in Montana in 1999 and claims his DNA would have been submitted to the CODIS database at that time.  Yet the request for DNA testing was not made until 2012, and testing in this matter not performed for three more years.  Appellant similarly asserts that his fingerprints would have been in the national Integrated Automated Fingerprint Identification System by at least 1999, the year the system became fully automated.  However, he does not address the prosecution's argument below that he failed to offer specific proof as to when his fingerprints were actually entered into the national database.

Appellant contends he was prejudiced by the delay, listing several unavailable witnesses that he asserts could have offered favorable testimony had the DNA testing been accomplished earlier.  He also points to the loss of

13

physical evidence, including the demolition of the hotel where the crime had occurred, and cites the faded memories of any potential witnesses, including himself. The trial court found that much of the prejudice asserted by appellant was either speculative or overstated, but appellant had nonetheless made a showing of "slight prejudice."

In opposing his motion to dismiss, the prosecution below argued that the delay was justified and outweighed any prejudice that may have resulted. The prosecution submitting evidence showing that appellant's DNA sample was not collected until June 2002 following his conviction in another crime, and was not uploaded into the CODIS database until February 2005. The lead DNA analyst for the Department's crime laboratory testified that the sperm cell sample was so degraded that testing kits available in 2005 would not have been able to fully amplify or analyze the cells. Suitable testing kits were not made available until 2007. Thus, the People contend, any analysis of delay should be measured from 2007 when DNA testing of the sperm sample became feasible.

We conclude ample evidence supports the trial court's determination that the delay in prosecution was justified. The evidence establishes that DNA technology could not have matched appellant to this case until 2007 at the earliest. Appellant faults the Department for taking several more years to process the DNA evidence, but as the trial court found, the Department was laboring under a severe DNA testing backlog, and with finite resources it could not address every case expeditiously. "[T]he difficulty in allocating scarce . . . resources (as opposed to clearly intentional or negligent conduct) [is] a valid justification for delay." (*Dunn-Gonzalez, supra,* 47 Cal.App.4th at p. 915.) Thus, a substantial portion of the delay was entirely unavoidable, and appellant fails to demonstrate that the additional delay caused by a

14

failure to seek DNA testing sooner or to process the request was the result of negligence.

The situation before us is analogous to the one in *Nelson, supra,* 43 Cal.4th 1242. In that case, investigators in 2002 compared evidence from a 1976 murder scene with the defendant's DNA and identified him as a possible donor of the evidence. A jury later convicted defendant of murder. On appeal, the defendant argued that the delay in prosecution violated his right to due process. (*Nelson,* at p. 1247.) He challenged the delays in the investigation, arguing that DNA technology had existed years before the law enforcement agency made the comparison in his case and the delay amounted to negligence.

The Supreme Court disagreed: "A court may not find negligence by second-guessing how the state allocates its resources or how law enforcement agencies could have investigated a given case. . . . It is not enough for a defendant to argue that if the prosecutorial agencies had made his or her case a higher priority or had done things a bit differently they would have solved the case sooner." (*Nelson, supra,* 43 Cal.4th at pp. 1256–1257.) The Supreme Court concluded that the minimal prejudice to the defendant was outweighed by the strong justification for the delay. (*Id.* at pp. 1255–1256).

By the same reasoning, appellant here cannot establish that delays in the investigation amounted to negligence. As the trial court noted, it is not the task of the courts to determine how police departments should manage their investigative resources between older or more recent homicides. Appellant did not become a suspect until he was identified through a DNA match in 2015. Prosecutors then worked to bolster their case by seeking a fingerprint match and investigating appellant. As the Supreme Court observed, " '[p]rosecutors are under no duty to file charges as soon as

probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt.' " (*Nelson*, *supra*, 43 Cal.4th at p. 1256.)  Under the circumstances, we conclude there was substantial justification for the delay.

Appellant's claim fares no better with respect to the delay in matching his fingerprints to the latent prints found at the crime scene.  A similar argument was rejected by the Supreme Court in *Cowan, supra,* 50 Cal.4th 401.  Following a murder in 1984, police discovered latent fingerprints at the crime scene.  (*Id.* at p. 417.)  An investigator compared the fingerprints to those of several known suspects, including the defendant, but found no match.  (*Id.* at p. 418.)  Ten years later, after the murder remained unsolved, the fingerprints were reexamined and found to match the fingerprints of the defendant, leading to his arrest.  (*Id.* at p. 420.)

The Supreme Court rejected defendant's claim that his case should be dismissed on due process grounds because the 10-year delay was assertedly caused by a deficient analysis of the fingerprints found at the murder scene. (*Cowan, supra,* 50 Cal.4th at p. 436.)  The court found no evidence of intentional delay or negligence.  "[A]t worst," it concluded, law enforcement "simply erred" and while the investigation may not have been perfect, "no investigation is." (*Ibid.*)  Here, appellant claims the Department acted negligently because it ran a fingerprint search through the statewide database system rather than the national database, which was automated in 1999.  Even if that were true, appellant provided no evidence of when his fingerprints were entered into the national fingerprint database.  Thus, any possible misstep by the Department falls far short of a finding of negligence on these facts.

16

We further conclude that appellant suffered only minimal prejudice by the delay, and therefore the trial court did not abuse its discretion in denying his motion. As discussed above, appellant could not have been identified by his DNA until 2007, at the earliest. By the end of 2008, five of the witnesses that appellant suggests could have offered favorable testimony had already died. Further, much of the potential testimony by these unavailable witnesses would have focused on the volatile relationship between Elias and Rosales. Such testimony would have been largely duplicative of Larson's testimony, who testified that the couple frequently argued late at night, and that he heard them "hollering and screaming" in Elias's hotel room at about 1:00 or 1:30 a.m. on the night of the murder. To the extent the witnesses could have supplied any additional information, appellant does not explain the significance of this evidence. For example, he notes that a witness named Maynard Harris had told police that he saw sheets tied to the drainpipe outside of Elias's window. He does not explain the significance of this evidence. While he suggests witnesses living on the reservation in Montana could have provided him with an alibi, he does not offer any specifics. Finally, appellant's own faded memory is of marginal relevance given that he had denied ever meeting Elias or ever visiting Oakland, California.

Considering the totality of the evidence, the trial court did not abuse its discretion in finding that, although appellant suffered some prejudice from the delay, there was substantial justification for the Department's actions. We conclude the trial court did not abuse its discretion in denying appellant's motion to dismiss.

## B.    Admission of Expert Hearsay under *People v. Sanchez*

Appellant contends that the trial court erred in admitting case-specific hearsay testimony from the prosecution's fingerprint expert in violation of

17

*People v. Sanchez* (2016) 63 Cal.4th 665 and confrontation clause principles. Over numerous defense objections, the court permitted Lankford to testify about prior fingerprint comparisons conducted by others based on her review of the case file, and in particular allowed plaintiff's expert to testify that "nobody in [the] fingerprint section had ever identified a match with the curtain rod." We conclude that the trial court erred in admitting this testimony, but the error was harmless beyond a reasonable doubt.

### i. *Additional Background*

Fingerprint expert Lankford testified that prior to conducting any fingerprint comparison, she reviewed the case file, which dated back to 1979. The case file contained latent prints collected from the crime scene such as the photograph of the bloody print found on the curtain rod. The file also contained exemplar prints of individuals for whom comparisons had been done, including Elias's boyfriend Martin Rosales.

Over defense counsel's objections on the grounds of hearsay, confrontation, foundation, and lack of personal knowledge, Lankford was permitted to testify that there had been prior fingerprint comparisons in the case, that there had been a comparison analysis performed with the fingerprint exemplar on file for Martin Rosilas, and that before she began her analysis "nobody in [the] fingerprint section had ever identified a match with the curtain rod." Lankford was not specifically asked to give the results of the fingerprint comparison with Rosales's print, but she confirmed that if there had been a match, a report would have been generated and she would not have been asked to do a comparison with a different suspect. The trial court overruled the defense hearsay objections on the ground that Lankford's testimony was not offered for its truth.

18

### ii. Legal Principles

"Hearsay" is an out-of-court statement, including a written verbal or oral expression, offered for the truth of the matter asserted. (Evid. Code, §§ 1200, subd. (a), 225.) In *Sanchez*, the Supreme Court held that "[w]hen any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay. It cannot logically be maintained that the statements are not being admitted for their truth." (*Sanchez*, *supra*, 63 Cal.4th at p. 686 & fn. 13.) "Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried." (*Id*. at p. 676.) Such statements may not be related by an expert as true "unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Id*. at p. 686.)

While an expert may rely on hearsay evidence in forming his or her opinion, and may testify generally to background information that may be of assistance to the jury (*Sanchez*, *supra*, 63 Cal.4th at p. 676), the expert may not relate case-specific facts outside his or her personal knowledge that have not been independently established by competent evidence or that do not come within any other hearsay exception. (*Sanchez,* at pp. 675–677, 686.) If the case-specific hearsay is testimonial, the evidence must also satisfy the Sixth Amendment's confrontation clause. (*Sanchez,* at p. 680.)

In *Crawford v. Washington* (2004) 541 U.S. 36, 53–54, 59, the United States Supreme court held that the confrontation clause of the Sixth Amendment prohibits the admission of testimonial hearsay unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. The *Sanchez* court considered "the degree to which the *Crawford* rule limits an expert witness from relating case-specific

hearsay content in explaining the basis for his opinion." (*Sanchez, supra,* 63 Cal.4th at p. 670.) *Sanchez* adopted the following rule: "If the case is one in which a prosecution expert seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing" (*Id.* at p. 686.)

The *Sanchez* court clarified that "[t]estimonial statements are those made primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony. Nontestimonial statements are those whose primary purpose is to deal with an ongoing emergency or some other purpose unrelated to preserving facts for later use at trial." (*Sanchez, supra,* 63 Cal.4th at p. 689, fn. omitted.) We note that "to be testimonial the statement must be made with some degree of formality or solemnity." (*People v. Dungo* (2012) 55 Cal.4th 608, 619.)

In this appeal, we must address whether the challenged testimony constituted case-specific hearsay not covered by a hearsay exception, and if so, whether the hearsay was testimonial and the appellant was afforded the opportunity for cross-examination.

### iii. *Application*

We conclude that a portion of Lankford's testimony in which she related case-specific facts about prior fingerprint analyses was erroneously admitted and constituted testimonial hearsay. Lankford introduced an out-of-court statement that was offered for the truth of the matter when she told the jury that previous unnamed fingerprint examiners had compared Rosales's prints to prints found at the crime scene, and that "nobody in [the] fingerprint section had ever identified a match with the curtain rod." This testimony was indisputably case-specific, as it concerned evidence examined

20

as part of the murder investigation in this case. Lankford's hearsay statements were testimonial because they concerned fingerprint comparisons prepared by law enforcement officials to memorialize facts concerning a completed crime and intended for use in a criminal trial. (See, e.g., *People v. Lara* (2017) 9 Cal.App.5th 296, 337 [gang expert testifying about police reports created by other officers during official investigations of predicate offenses was testimonial hearsay].) Finally, Lankford's testimonial hearsay violated appellant's Sixth Amendment right of confrontation because there is no indication that appellant was given the opportunity to cross-examine these declarants. The prosecution was essentially permitted to introduce the opinion of a second expert without exposing that witness to cross-examination.

We reject the Attorney General's suggestion that Lankford's testimony was not offered for the truth but rather as background to explain why she had been asked to perform a fingerprint analysis. Lankford's statement that previous examiners had not matched the bloody fingerprint to Rosales, a possible third-party suspect, was unnecessary to support her conclusion that appellant's print was a match to the one found on the bloody curtain rod. Lankford did not rely on this evidence to arrive at her result. Instead, she conducted her own analysis, comparing the latent fingerprint on the curtain rod to appellant's exemplar. We fail to see why the prosecution would have found it necessary to question Lankford along these lines if not to establish that Rosales's fingerprint had already been excluded. Indeed, the prosecution emphasized this point in closing argument when he argued that Lankford would not have undertaken another analysis if Rosales's exemplar had matched the print on the curtain rod. The Attorney General does not contend that Lankford's hearsay testimony about prior fingerprint analyses

21

was subject to a hearsay exception or independently established by competent evidence.  In sum, the admission of this evidence ran afoul of the rules set forth in *Sanchez.*

### iv.     The Error Was Harmless

While we conclude the trial court erred in admitting Lankford's statements about the results of prior fingerprint identification efforts, the error was harmless beyond a reasonable doubt given the totality of the evidence in this case.  " ' "Confrontation clause violations are subject to federal harmless-error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24." ' " (*People v. Livingston* (2012) 53 Cal.4th 1145, 1159; *People v. Geier* (2007) 41 Cal.4th 555, 608.)  Since *Chapman,* our high court has " 'repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' " (*Geier,* at p. 608.)  "The harmless error inquiry asks:  'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' " (*Ibid.*; *Livingston,* at p. 1159.)

The DNA evidence placed appellant at the murder scene through the DNA profile taken from semen obtained from the victim's vagina.  The DNA profile in this case would be expected to occur approximately one in 16 trillion members of the population.  The accuracy and reliability of the DNA identification was never contested, and defense counsel conceded that the DNA found in the victim belonged to appellant and that appellant and the victim must have had sexual intercourse at some point in time.  Appellant's fingerprint was also positively matched to the latent fingerprint found on the bloody curtain rod.  The DNA evidence combined with the fingerprint match

constitutes overwhelming proof that appellant committed the crime as charged.

In addition, the erroneously admitted testimony pertained only to the prior fingerprint analyses. Lankford personally examined the latent print and compared it to appellant's prints that had been obtained from the FBI, confirming that his prints matched the one from the curtain rod. While appellant's expert witness, Professor Cole, offered testimony regarding potential sources of bias, there was no evidence that the accuracy of Lankford's identification had been tainted by bias. Nor did any expert witness offer a direct challenge to her identification. It is clear beyond a reasonable doubt that a rational jury would have found appellant guilty even absent the error.

Appellant argues that the inadmissible evidence "obliterated from the jurors' minds any possibility that Rosales was involved." He further asserts that the prejudicial effect of Lankford's testimony was exacerbated by the prosecutor's closing arguments, a matter we address below. But even if there had been no mention of a prior fingerprint comparison to Rosales, any reasonable juror would have surmised that he had been eliminated as the person who left the print on the bloody curtain rod. As the Attorney General notes, both Lankford and Professor Cole testified that fingerprints are unique to every person. Thus, because appellant's fingerprint matched the latent print on the bloody curtain rod, then Rosales's fingerprint necessarily did not. Accordingly, the error was harmless beyond a reasonable doubt.

## C. Alleged Disparagement of Defense Counsel

Appellant claims the prosecutor committed misconduct in his closing argument by disparaging defense counsel in front of the jury.

### i. Additional Background

In his closing argument, defense counsel urged the jurors to strongly consider any doubts they had about the evidence, even doubts that were not quantifiable, suggesting that any doubt could be a "reasonable doubt" because the jurors represented the "gold standard" of reasonableness. In his rebuttal argument, the prosecutor said that defense counsel had engaged "in a bit of flattery" by telling the jurors that they "all passed the gold standard because you're all here."

Shortly thereafter, the prosecutor stated: "But the slick part of it is[,] engage in a little bit of flattery and then let's go with this fal[se] syllogism. Therefore, every one of you is a reasonable person. Therefore if any one of you has a doubt, therefore, that is a reasonable doubt. No. That's not how it works. It's part of what the defense often attempts to do, which is empower the lone dissenter in a jury, all right. Because one juror can hang up a case." Defense counsel's objection that counsel was "disparaging [the] defense" was overruled. Later, the prosecutor stated that defense counsel had made "an attempt to lead you astray" by arguing that the untested straightened coat hanger found in Rosales's apartment could support a reasonable doubt.

### ii. Legal Principles

As official representatives of the people, prosecutors have a duty to be reasonably objective in their closing statements. (*People v. Talle* (1952) 111 Cal.App.2d 650, 677.) "A prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel." (*People v. Hill* (1998) 17 Cal.4th 800, 832.) "Casting uncalled for aspersions on defense counsel directs attention to largely irrelevant matters and does not constitute comment on the evidence or argument as to inferences to be drawn therefrom." (*People v. Thompson* (1988) 45 Cal.3d 86,

24

112.)  The Supreme Court has rejected a claim of prosecutorial misconduct where the prosecutor observed during closing remarks that " 'any experienced defense attorney can twist a little, poke a little, try to draw some speculation, try to get you to buy something,' " finding this did not "amount to a personal attack on counsel's integrity." (*People v. Medina* (1995) 11 Cal.4th 694, 759 (*Medina*).)  On the other hand, "[i]t is improper for the prosecutor to imply that defense counsel has fabricated evidence or to otherwise malign defense counsel's character." (*People v. Herring* (1993) 20 Cal.App.4th 1066, 1075 (*Herring*).)

When a claim of misconduct is based on the prosecutor's remarks to the jury, we consider whether there is a reasonable likelihood that the jury construed the challenged remarks in an objectionable fashion.  (*People v. Williams* (2013) 56 Cal.4th 630, 671 (*Williams*).)  Here, the prosecutor's remarks went no further than the comment in *Medina* that experienced defense attorneys " 'twist' " or " 'poke' " to get the jury to " 'buy something.' " (*Medina, supra,* 11 Cal.4th at p. 759.)

Rarely does a prosecutor's personal attack on defense counsel amount to reversible error.  (*People v. Taylor* (2001) 26 Cal.4th 1155, 1167.)  Prosecutorial misconduct requires reversal under the federal Constitution when it infects the trial with such unfairness as to make the resulting conviction a denial of due process.  (*Williams, supra,* 56 Cal.4th at p. 671.)  Misconduct not rising to this level is reviewed for prejudice under state law, where we consider "whether it is reasonably probable that a jury would have reached a more favorable result absent the objectionable comments." (*Ibid*.; *Herring, supra,* 20 Cal.App.4th at p. 1074.)  Even if some misconduct had occurred, we would conclude there was no prejudice under either standard.

25

Moreover, the trial court instructed the jury that comments by the attorneys were not evidence (CALCRIM Nos. 104, 222) and that the jury alone had to decide what happened based solely on the trial evidence (CALCRIM No. 200). These instructions serve to minimize any potential prejudice from the prosecutor's closing remarks. (See, e.g., *People v. Smith* (2005) 135 Cal.App.4th 914, 925; *People v. Loker* (2008) 44 Cal.4th 691, 739.) We are not persuaded that the prosecution's closing arguments resulted in any error, much less reversible error.

**D.  Imposition of Restitution Fines, Fees, and Assessments**

Appellant contends that, under *People v. Dueñas* (2019) 30 Cal.App.5th 1157, the trial court violated his federal constitutional rights by imposing various fees and fines without making a determination of his ability to pay. We conclude appellant has forfeited his *Dueñas*-related claims.[3]

The trial court imposed a $10,000 restitution fine (§ 1202.4, subd. (b)), a $40 court assessment fee (§ 1465.8), a $30 criminal conviction assessment fee (Gov. Code, § 70373), and a sex offender fine of $300 (§ 290.3). Direct victim restitution was reserved. Appellant did not object to the fines or fees. Relying on *Dueñas,* he now claims the trial court erred because it did not sua sponte hold a hearing to determine whether defendant could pay the fine and fees before imposing them.

By failing to object to the fine or fees and failing to request a hearing on his ability to pay them, defendant forfeited any *Dueñas* objection—

---

[3] In *Dueñas, supra,* 30 Cal.App.5th 1157, the Court of Appeal for the Second District, Division Seven, held that imposing assessments and a fine on an indigent defendant violated due process-based rights that ensure access to the courts and bar incarceration based on nonpayment of fines due to indigence. (*Id.* at pp. 1167–1168, 1172.) The issues raised in *Dueñas* are currently before the California Supreme Court. (See *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.)

particularly where, as here, *Duenas* was decided before his sentencing. (See *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1030–1031 (*Gutierrez*); accord, *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1054; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1066–1067; *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153 (*Frandsen*).) His "failure to challenge the fees in the trial court precludes him from doing so on appeal." (*People v. Aguilar* (2015) 60 Cal.4th 862, 864.)

Turning to the $10,000 restitution fine, section 1202.4 requires the imposition of such a fine upon conviction of a crime, unless the court "finds compelling and extraordinary reasons for not doing so." (§ 1202.4, subd. (b).) The minimum restitution fine for felony convictions is $300, and the maximum fine is $10,000. (*Id.,* subd. (b)(1).) The statute expressly provides that "[a] defendant's inability to pay shall not be considered a compelling and extraordinary reason not to impose a restitution fine." (*Id.,* subd. (c).) However, "[i]nability to pay may be considered . . . in increasing the amount of the restitution fine in excess of the minimum fine pursuant to paragraph (1) of subdivision (b)." (*Ibid.*) The burden of demonstrating such inability to pay lies with the defendant. (*Id.,* subd. (d); see *People v. Castellano* (2019) 33 Cal.App.5th 485, 490 ["Consistent with *Dueñas,* a defendant must in the first instance contest in the trial court his or her ability to pay."].)

Here, appellant did not object to imposition of the maximum restitution fine. Such an objection clearly would not have been futile as trial courts are statutorily authorized to consider a defendant's inability to pay any restitution fine above the statutory minimum. (§ 1202.4, subds. (c) & (d).) Accordingly, we conclude that appellant forfeited any challenge to the restitution fine. (See *People v. Smith* (2020) 46 Cal.App.5th 375, 395 (*Smith*) [failure to object to imposition of maximum restitution fine on inability-to-pay

27

grounds resulted in forfeiture of claim of inability to pay]; *Gutierrez, supra,* 35 Cal.App.5th 1027 at pp. 1032-1033 [same, noting that "even before *Dueñas* a defendant had every incentive to object to imposition of a maximum restitution fine based on inability to pay"]; *Frandsen, supra,* 33 Cal.App.5th 1126 at p. 1154 [same].)

Additionally, several courts have held that, where a defendant does not object to imposition of the maximum restitution fine on grounds of inability to pay, such failure also forfeits claims of inability to pay "much smaller" criminal assessments. (*Smith, supra,* 46 Cal.App.5th at p. 395; see *Gutierrez, supra,* 35 Cal.App.5th at p. 1033 ["As a practical matter, if [defendant] chose not to object to a $10,000 restitution fine based on an inability to pay, he surely would not complain on similar grounds regarding an additional $1,300 in fees."]; *Frandsen, supra,* 33 Cal.App.5th at p. 1154 ["Given his failure to object to a $10,000 restitution fine based on inability to pay, [defendant] has not shown a basis to vacate assessments totaling $120 for inability to pay."].) We agree. Unlike the *Dueñas* defendant, appellant had a statutory right to an ability-to-pay hearing that he did not exercise, thus forfeiting his appellate claim that such a hearing was required. Had he requested such a hearing, the same evidence relevant to his inability to pay the $10,000 restitution fine could also have established an inability to pay these smaller assessments. We thus conclude that appellant has forfeited the opportunity to raise an ability-to-pay challenge with respect to the court assessment fee, the criminal conviction assessment fee, and the sex offender fine.

Appellant alternatively argues that his trial counsel was ineffective for failing to request an ability-to-pay hearing or object to the imposition of fines and fees. "[A] defendant claiming the ineffective assistance of counsel is required to show both that counsel's performance was deficient and that

28

counsel's errors prejudiced the defense." (*People v. Hernandez* (2012) 53 Cal.4th 1095, 1105.)  To establish prejudice, a "defendant must show that there is a reasonable probability"—meaning "a probability sufficient to undermine confidence in the outcome"—"that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 694 (*Strickland*).)

The record does not disclose why appellant's counsel did not object to the fine and fees.  However, it is conceivable his attorney decided not to object for reasons unrelated to his ability to pay.  A defendant's inability to pay is just one among many factors the court should consider in setting the restitution fine above the minimum.  The court should also consider "the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered losses as a result of the crime, and the number of victims involved in the crime.  Those losses may include pecuniary losses to the victim or his or her dependents as well as intangible losses, such as psychological harm caused by the crime." (§ 1202.4, subd. (d).)  Appellant's attorney may have concluded that, given the seriousness of his offense and the psychological harm to Elias's family, any objection to the maximum restitution fine would have been fruitless.

We also note that "in determining whether a defendant has the ability to pay a restitution fine, the court is not limited to considering a defendant's *present* ability but may consider a defendant's ability to pay in the future." (*People v. Frye* (1994) 21 Cal.App.4th 1483, 1487.)  This includes a defendant's ability to earn prison wages. (*Ibid*.)  Here, appellant was sentenced to a term of life without the possibility of parole, and it was within the trial court's discretion to consider his ability to earn prison wages while

serving his life sentence. (See *Frye,* at p. 1487.) Appellant has not indicated that he lacks the ability to work and earn wages over the course of his term of confinement.

We reach the same conclusion as to the other fees and fines. "[A] defense counsel's decision whether to object to the imposition of fines and fees can encompass factors beyond a defendant's financial circumstances, especially in serious cases involving potentially long prison sentences. . . . We cannot speculate, given the absence of information before us, what led to defense counsel's decision not to object, but a myopic focus on [defendant's] financial circumstances that neglects any of the other factors at play in a sentencing hearing may not provide an accurate picture of counsel's strategic calculus." (*People v. Acosta* (2018) 28 Cal.App.5th 701, 707.)

On this record, appellant has not shown "a reasonable probability" that the trial court would have reduced or stayed the restitution fine or stayed the assessments had trial counsel objected to them and requested a hearing. (*Strickland, supra,* 466 U.S. at p. 694.) Thus, we reject appellant's claim that his trial counsel provided ineffective assistance when he failed to raise appellant's inability to pay in response to the trial court's imposition of the restitution fine, the court assessment fee, the criminal conviction assessment fee, and the sex offender fine.

## E. Parole Revocation Fine

The June 26, 2019 minute order for sentencing states that appellant is to pay a restitution fine of $10,000 pursuant to section 1202.4, subdivision (b), "and an additional Parole Restitution Fine of $10,000 [§ 1202.45] is suspended pending successful completion of parole." The abstract of judgment indicates that the trial court imposed a parole revocation fine of $10,000 pursuant to section 1202.45 "suspended unless parole is revoked."

30

Appellant correctly notes that the reporter's transcript of the sentencing proceedings does not mention a parole revocation fine or section 1202.45. The Attorney General agrees that the abstract of judgment must be corrected to eliminate the parole revocation fine.

Numerous cases have vacated the parole revocation fines where the sentence includes no period of parole. (See, e.g., *People v. McWhorter* (2009) 47 Cal.4th 318, 380 [striking a parole revocation restitution fine under section 1202.45 where the defendant was convicted of special circumstance murder and sentenced to life without parole]; *People v. Andreasen* (2013) 214 Cal.App.4th 70, 74 [same].) We direct preparation of an amended abstract of judgment to correct this error. (*People v. Jones* (2012) 54 Cal.4th 1, 89.)

## DISPOSITION

The trial court is directed to prepare and forward to the Department of Corrections and Rehabilitation an amended abstract of judgment that omits the parole revocation fine. As modified, the judgment is affirmed.

_____

Sanchez, J.

WE CONCUR:


_____

Humes, P. J.


_____

Banke, J.

A157735  *People v. Eagle*